11-0211-cv
Rothstein v. UBS AG

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2011

(Argued: March 1, 2012                    Decided: February 14, 2013)

Docket No. 11-0211-cv

_____

RACHEL ROTHSTEIN, FRED ROTHSTEIN, NORA ROTHSTEIN, JENNY RUBIN, DEBORAH RUBIN, DANIEL MILLER, ABRAHAM MENDELSON, STUART ELLIOT HERSH, RENAY E. FRYM, NOAM ROZENMAN, ELENA ROZENMAN, TZVI ROZENMAN, SHAUL STERN, individually and as personal representative of the Estate of Leah Stern, JOSEPH STERN, SHIMSON STERN, YOCHEVED KUSHNER, JULIA KATZ, ALICE FEINSTEIN, CHARLES FEINSTEIN, EMILE FEINSTEIN, ALEXANDER FEINSTEIN, CHAIM KAPLAN, individually and as natural guardian of plaintiffs Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, RIVKA KAPLAN, individually and as natural guardian of plaintiffs Mushka Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan, MUSHKA KAPLAN, minor, ARYE LEIB KAPLAN, minor, MENACHEM KAPLAN, minor, CHANA KAPLAN, minor, EFRAIM KAPLAN, minor, AVISHAI REUVANE, ELISHEVA ARON, CHAYIM KUMER, NECHAMA KUMER, NETANEL HERSKOVITZ, MARTIN HERSKOVITZ and PEARL HERSKOVITZ, BENNETT and PAULA FINER, individually and as legal guardians for plaintiff Chana Nachenberg, CHANA NACHENBERG, DAVID NACHENBERG, SARA NACHENBERG, minor, ZEV FINER, SHOSHANA FINER OHANA, HOWARD M. GREEN, and MINA DORA GREEN,

                              Plaintiffs-Appellants,

                    - v. -

UBS AG,

                              Defendant-Appellee.[*]

_____

---

[*]   The Clerk of the Court is directed to amend the official caption to conform with the above.

Before: KEARSE, LOHIER, and DRONEY, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Jed S. Rakoff, Judge, dismissing, for lack of standing and failure to state an Anti-Terrorism Act claim, see 18 U.S.C. § 2331 et seq., against bank for facilitating terrorism by transferring U.S. currency to Iran. See 647 F.Supp.2d 292 (2009); 772 F.Supp.2d 511 (2011).

Affirmed.

NATHANIEL A. TARNOR, Washington, D.C. (Robert J. Tolchin, Jaroslawicz & Jaros, New York, New York, on the brief), for Plaintiffs-Appellants.

JONATHAN ROSENBERG, New York, New York (Daniel L. Cantor, Jacqueline V. Roeder, O'Melveny & Myers, New York, New York; Jonathan D. Hacker, Anton Metlitsky, O'Melveny & Myers, Washington, D.C.; Andrew J. Pincus, Marc R. Cohen, Alex C. Lakatos, Paul W. Hughes, Mayer Brown, Washington, D.C., on the brief), for Defendant-Appellee.

PILLSBURY WINTHROP SHAW PITTMAN, New York, New York (Frederick A. Brodie, of counsel), filed a brief for Amicus Curiae Government of Switzerland, in support of Appellee.

DECHERT, New York, New York (Linda C. Goldstein, of counsel; Brian D. Ginsberg, Covington & Burling, New York, New York, of counsel), filed a brief for Amici Curiae Institute of International Bankers, Association of German Banks, economiesuisse, European Banking Federation, Federation of German Industries, French Banking Federation, Mouvement des Entreprises de France, and Swiss Bankers Association, in support of Appellee.

KEARSE, Circuit Judge:

Plaintiffs Rachel Rothstein et al. appeal from a judgment of the United States District Court for the Southern District of New York, Jed S. Rakoff, Judge, dismissing their action brought

under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 et seq., against defendant UBS AG ("UBS"), alleging that plaintiffs were direct or indirect victims of terrorist attacks in Israel facilitated by UBS's furnishing United States currency to Iran, which the United States Department of State has listed as a state sponsor of terrorism. The district court granted UBS's motion to dismiss plaintiffs' First Amended Complaint ("FAC" or "Complaint"), concluding principally that, because the Complaint did not plausibly allege that plaintiffs' injuries were proximately caused by UBS's conduct, plaintiffs lacked standing and the Complaint failed to state a claim on which relief can be granted. On appeal, plaintiffs contend principally that the Complaint alleged a chain of causation between transfers of funds to Iran by UBS and plaintiffs' injuries at the hands of various terrorist groups sponsored by Iran, sufficient to establish traceability for purposes both of standing and of stating a claim under the ATA. For the reasons that follow, we conclude that plaintiffs had standing to assert their ATA claims but

that the Complaint failed to state a claim on which relief can be granted.

## I. BACKGROUND

The Complaint, whose factual allegations we take as true, as we must in reviewing a dismissal for failure to state a claim or a lack-of-standing dismissal on the basis of the pleadings, see, e.g., Selevan v. New York Thruway Authority, 584 F.3d 82, 88 (2d Cir. 2009), alleged principally as follows. Plaintiffs are United States citizens who either were themselves physically or psychologically injured in terrorist attacks in Israel, or are survivors of victims of such attacks and

3

have thus suffered emotional injuries. UBS is a financial institution incorporated and headquartered in Switzerland, with offices in the United States.

A. The Events Alleged in the Complaint

    1. Iran and Terrorism

The Complaint alleged that Iran has, continuously since 1979, pursued an official policy designed to cause the murder and/or expulsion of the Jewish residents of Israel, bring about the eradication of the State of Israel, and cause Israel's replacement with an Islamic state. (See FAC ¶ 48.) In furtherance of these goals, "it has been the continuous and official policy of Iran" since 1979 "to use terrorism." (Id. ¶ 50.) Accordingly, since the early 1980s, "Iran has provided the Hamas terrorist organization with extensive material support, including hundreds of millions of dollars in funds, specifically to enable, encourage and cause Hamas to carry out terrorist attacks against Jewish civilians in Israel, the West Bank and the Gaza Strip." (Id. ¶ 50(b).)

> Iran has consistently conditioned its provision of material support and resources to Hamas on Hamas' agreement to utilize the support and resources to carry out terrorist attacks against Jewish civilians in Israel, the West Bank and Gaza. . . . Under that agreement, Hamas undertook to carry out acts of terrorism against Jews in Israel, the West Bank and Gaza, and in return Iran undertook to provide Hamas with financial support to carry out such attacks. The purpose of this agreement was to terrorize the Jewish civilian population in Israel. All terrorist attacks carried out by Hamas are carried out further to the aforementioned agreement with Iran.

(Id.; see also id. ¶ 50(c) (identical allegations of Iran agreement with, and support of, the Palestine Islamic Jihad terrorist organization ("PIJ")).)

4

In addition, in 1982 Iran "established the Hizbollah terrorist organization." (Id. ¶ 50(a).) Since that time Iran has "controlled, funded and operated" Hizbollah and used that organization "to carry out thousands of terrorist attacks against Israeli civilian and military targets in Israel, the West Bank and the Gaza Strip, in which hundreds of innocent[] victims have been murdered and thousands more maimed." (Id.)

The support provided by Iran to Hizbollah, Hamas, and PIJ "for the specific purpose of facilitating and causing terrorist attacks against innocent civilians" (FAC ¶ 52) included money in the form of "hundreds of millions of dollars" (id. ¶¶ 50(b) and (c))--"tens of millions of dollars in cash annually" (id. ¶ 52)--"both directly and via . . . 'Iranian Government Organs,'" including the Central Bank of Iran and other Iranian government-owned banks (id. ¶ 53). The terrorist organizations needed support in the form of cash because they "were unable to freely use banking services (e.g. wire transfers, checks) to pay for those activities due to counterterrorism sanctions and restrictions imposed by the U.S. government" (id. ¶ 55; see also id. ¶ 56), and "cash dollars are a universally accepted currency and means of payment" (id. ¶ 55).

> If Hizbollah[ and] Hamas . . . had not received cash dollars from Iran, their ability to carry out terrorist attacks and (a) to build and maintain their respective operational infrastructures for the planning and execution of terrorist attacks; (b) to purchase and store weapons, explosives and other materiel used by them to carry out terrorist attacks; (c) to pay, train, transport and shelter their terrorist operatives; and (d) to carry out specific terrorist attacks, would have been severely crippled and limited.

(FAC ¶ 59.)

Since 1984, the United States Department of State ("State Department") has continuously, under § 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), designated Iran a state sponsor of terrorism. (See id. ¶ 51.) In 1996, a State Department report found

5

that Iran had continued "to encourage Hizballah [sic], HAMAS, [and] the PIJ" to engage in "violence and terrorism," and that Iran was "the premier state sponsor of international terrorism." (Id. (internal quotation marks omitted).) And in 2006, the Secretary of State described Iran as "the central banker for terrorism around the world." (Id. ¶ 102 (internal quotation marks omitted).

2. UBS as a Custodian of U.S. Currency

In 1996, the United States Federal Reserve System ("Federal Reserve" or "Fed") established an Extended Custodial Inventory ("ECI") Program "to facilitate the international distribution of U.S. banknotes and to protect against sudden spikes in the international demand for U.S. currency." (FAC ¶ 62.) Under the ECI Program, the United States government designates private commercial banks to function as "overseas cash depots that hold currency on behalf of the Federal Reserve on a custodial basis." (Id.) Each ECI facility maintains an account with the Federal Reserve; when a customer withdraws U.S. dollars from, or deposits U.S. dollars in, the facility, the facility's ECI account with the Fed is debited, or credited, accordingly. (Id.) The ECI facility is obligated "to provide monthly reports of its transactions and to comply with all regulations issued by the Office of Foreign Asset[s] Control ('OFAC') of the U.S. Treasury." (Id. ¶ 64.)

OFAC regulations provide, in part, that "no United States person, on or after [August 22, 1996], knowing or having reasonable cause to know that a country is designated under section 6(j) of the Export Administration Act . . . as a country supporting international terrorism, shall engage in a financial transaction with the government of that country." 31 C.F.R. § 596.201(a). (See generally FAC ¶ 100.) The criminal code section implemented by that regulation defines "United States person" to include "any person in the United States." 18 U.S.C. § 2332d(b)(2)(D). Financial transactions, as

defined in 18 U.S.C. § 1956(c)(4)--which § 2332d(b)(1) incorporates by reference--include transactions (affecting interstate or foreign commerce) "involving the movement of funds" by any means or "involving one or more monetary instruments," 18 U.S.C. §§ 1956(c)(4)(A)(i) and (ii); "monetary instruments," as used in § 1956(c)(4), include "currency of the United States," 18 U.S.C. § 1956(c)(5). (See generally FAC ¶¶ 93-100.)

UBS, which has numerous offices in the United States and thus is a "'United States person' within the meaning of § 2332d" (id. ¶ 96), entered into an ECI agreement with the Federal Reserve in 1996 to operate an ECI facility in Zurich, Switzerland (see id. ¶ 64). In the ECI Agreement, UBS took on the obligation not to engage in financial transactions with the government of any country designated a state sponsor of terrorism. (See id. ¶¶ 64-65, 100.) UBS also agreed to provide monthly reports of its U.S. currency transactions. (See id. ¶ 64.)

### 3. UBS and Iran

In 2003, after American soldiers discovered, concealed on property of Saddam Hussein in Iraq, approximately $650 million in U.S. currency in Federal Reserve wrappers, an investigation was launched into which of four likely ECI facilities, one of which was UBS, was the source of that currency. (See FAC ¶¶ 66-68.) Documents eventually produced by UBS revealed, to the extent pertinent here, "that UBS had transferred U.S. currency to Iran and to Iranian Government Organs." (Id. ¶ 71.) These transfers were forbidden by OFAC regulations (see id. ¶ 100), and had not been reported to OFAC or the Federal Reserve by UBS (id. ¶ 72).

In light of discoveries that UBS had engaged in forbidden U.S. currency transactions with Iran, as well as with Cuba, Libya, and the former Yugoslavia, at times when such transactions

7

were prohibited (see FAC ¶ 86 ("[f]rom the time UBS began working with the Fed in 1996 until sometime [in 2003] . . . UBS used the Federal Reserve to conduct" with those countries "billions of dollars worth of transactions" (internal quotation marks omitted))), the Federal Reserve terminated UBS's ECI Agreement in 2003. (See id. ¶¶ 78-88.) In 2004, pursuant to an "Order of Assessment of a Civil Money Penalty Issued Upon Consent" (id. ¶ 82), the Federal Reserve fined UBS $100 million (id. ¶ 83).

### 4. Plaintiffs' Injuries

The Complaint alleged that plaintiffs were injured, and/or had family members who were injured or killed, in five bombings and several rocket attacks in Israel, conducted by Hamas or Hizbollah between July 30, 1997, and July 22, 2006. (See FAC ¶¶ 4-43.) It alleged that the ability of Hizbollah and Hamas to, inter alia, purchase weapons and other materiel, train their terrorist operatives, and carry out those attacks was substantially increased by those organizations' receipt of cash dollars from Iran. (See id. ¶¶ 59-60.)

The fact that Iran was subject to United States government sanctions made it difficult for Iran to obtain the large sums of cash dollars needed for the Hizbollah and Hamas operations. (Id. ¶ 61.) The Complaint alleged that "UBS solved this problem for Iran by illegally providing Iran with hundreds of millions of dollars in cash between 1996 and 2004 . . . ." (Id.)

### B. Proceedings in the District Court

In 2008, plaintiffs commenced the present action under the civil liability provision of the ATA, which provides that

8

[a]ny national of the United States <u>injured</u> in his or her person, property, or business <u>by reason of an act of international terrorism</u>, or his or her estate, survivors, or heirs, <u>may sue therefor</u> in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees,

18 U.S.C. § 2333(a) (emphases added). To the extent not later withdrawn by plaintiffs, the FAC alleged that UBS was liable for aiding and abetting international terrorism in violation of the ATA (Count One) and aiding and abetting violations of customary international law, as made part of federal common law (Count Two). UBS moved to dismiss the Complaint for failure to state a cause of action and for lack of standing.

In an opinion reported at 647 F.Supp.2d 292 (2009) ("<u>Rothstein I</u>"), the district court granted the motion to dismiss. Noting that the Complaint did not allege that UBS had any direct relationship with terrorist organizations or involvement in any of the attacks that caused plaintiffs' injuries, the court concluded that the "extended chain of inferences" asserted by plaintiffs was

> far too attenuated to provide plaintiffs with sufficient standing to bring this action under federal law. See <u>Allen v. Wright</u>, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (<u>standing requires that the injury be "fairly traceable" to the alleged actions of the defendant</u>); <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 42-43, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (standing is not established where injury results from "the independent action of some third party not before the court"); <u>see also</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (from a pleading perspective, "[f]actual allegations must be enough to raise a right to relief above the speculative level"); <u>Ashcroft v. Iqbal</u>, -- U.S. --, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868 (2009) (affirming <u>Twombly</u>).

> Specifically, <u>plaintiffs, to establish standing here, must at a minimum allege facts that show a proximate causal relationship between UBS's transfers of funds to Iran and Hamas' and Hezbollah's [sic] commission of the terrorist acts that caused plaintiffs' injuries</u>. This they have entirely failed to do.

<u>Rothstein I</u>, 647 F.Supp.2d at 294 (emphases ours). The court continued:

Among many other deficiencies in the causal chain, the First Amended Complaint ("Am. Compl.") does not allege that UBS is a primary or even relatively significant source of U.S. banknotes for the Iranian government. Moreover, cash dollars have multiple legitimate uses besides funding terrorism, and, as the amended complaint itself states, "[U.S.] cash dollars are a universally accepted currency and means of payment." Am. Compl. ¶ 55. Further still, there are no specific allegations showing that the terrorist groups here in question raise their funds from monies transferred from Iran. Without multiplying examples, the point is that plaintiffs' allegations here are far too speculative to provide the plausible indication of proximate causation necessary to establish plaintiffs' standing in this case.

Id. (emphases added).

For essentially the same reason, the district court also concluded that the Complaint failed to state a claim on which relief can be granted under the ATA. The court stated that the language of § 2333(a), granting a private right of action to a United States national injured "by reason of" an act of international terrorism, is essentially a requirement that a plaintiff show that his injury was proximately caused by the defendant. See Rothstein I, 647 F.Supp.2d at 295 (noting that the "by reason of" language in the private-right-of-action provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and the Clayton Antitrust Act, 15 U.S.C. §§ 12-27, "has typically been construed to be synonymous with 'proximate cause'"). The court concluded that "[i]f the allegations here are so speculative and attenuated as to deprive plaintiffs of standing, it follows a fortiori that they fail to adequately plead causation." Rothstein I, 647 F.Supp.2d at 295.

The court further concluded that Count One of the Complaint was insufficient to state a claim on a theory of aiding and abetting.

[S]uch a theory would here require adequate allegations that the defendant not only knew that its funds would be used to sponsor terrorist acts by Hamas and Hezbollah [sic], but also intended to do so. . . .

10

No such allegations are remotely made here. In fact, the Court cannot discern any substantive allegation in the amended complaint that adequately alleges intent in any form.

Id.

Finally, the court concluded that plaintiffs' claims against UBS in Count Two for aiding and abetting violations of customary international law, as incorporated in federal common law, were preempted by the ATA. See id. at 296. The Complaint was dismissed in its entirety.

Plaintiffs appealed to this Court. While their appeal was pending, the United States Supreme Court decided Holder v. Humanitarian Law Project, 130 S. Ct. 2705 (2010) ("Humanitarian Law Project" or "HLP"), addressing the constitutionality of 18 U.S.C. § 2339B(a)(1), which makes it a federal crime knowingly to provide material support or resources to a foreign terrorist organization. In an order dated August 26, 2010, we stated that the district court had dismissed the complaint for lack of standing under Article III of the Constitution and for failure to state a claim; and while noting that this case and HLP were in "different posture[s] and addressed . . . different [ATA] provision[s]," Rothstein v. UBS AG, No. 09-4108 (2d Cir. Aug. 26, 2010) ("Rothstein II"), we concluded that it would be beneficial to have the district court consider the relevance of HLP in the first instance. We thus dismissed plaintiffs' appeal without prejudice and remanded to the district court for further consideration in light of HLP.

On remand, the district court received supplemental briefing from the parties, and, in an opinion reported at 772 F.Supp.2d 511 (2011) ("Rothstein III"), concluded that HLP did not warrant a different outcome.

As the Second Circuit suggested, there are several obvious and potentially dispositive differences between Humanitarian Law Project and Rothstein. To begin with, Humanitarian Law Project does not address Article

11

III standing, a central component of the Court's Rothstein decision. This is especially important as Article III "requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999). Indeed, no statute could cure plaintiffs' standing deficiencies, as Congress cannot "abrogate the Art. III minima." Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). Thus, neither 18 U.S.C. § 2339(B)(a)(1) nor the Supreme Court's interpretation thereof alters in any way plaintiffs' obligation to satisfy the "fairly traceable" prong of the standing inquiry, which requires them to plausibly plead that a defendant's alleged actions "materially increase[d] the probability of injury." Huddy v. F.C.C., 236 F.3d 720, 722 (D.C.Cir.2001).

Rothstein III, 772 F.Supp.2d at 515.

The district court pointed out that HLP also did not address § 2333(a)'s proximate causation requirement and that it involved different conduct, i.e., attempts by the HLP plaintiffs to donate funds directly to terrorist organizations. See Rothstein III, 772 F.Supp.2d at 516. The district court noted the Supreme Court's comment in HLP that "'[m]oney is fungible,' and . . . that even money given to terrorist groups for purportedly legitimate purposes can be 'redirected to funding the group's violent activities,'" Rothstein III, 772 F.Supp.2d at 517 (quoting HLP, 130 S. Ct. at 2729). But the district court concluded that that comment did not justify a conclusion that "the most remote and tenuous connections to organizations with some undefined relationship to undefined terrorist groups could subject potential defendants to ATA liability," Rothstein III, 772 F.Supp.2d at 518.

This renewed appeal followed.

12

## II. DISCUSSION

On appeal, plaintiffs contend that the district court erred in concluding that they lack standing to pursue their Count One claims against UBS under the ATA. They advance no argument that the district court erred in dismissing their Count Two claims under international law as incorporated into federal common law; accordingly, any challenge to the dismissal of Count Two is waived. Plaintiffs also contend that, once the court concluded that they lacked standing, it exceeded its authority in addressing the sufficiency of the complaint, and that, in any event, the court erred in concluding that Count One was insufficient to state a claim on which relief can be granted.

"We review de novo a district court's dismissal of a complaint for lack of standing, see Fed.R.Civ.P. 12(b)(1), and for failure to state a claim, see Fed. R. Civ. P. 12(b)(6). . . . In conducting this review, we . . . construe plaintiffs' complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor." Selevan v. New York Thruway Authority, 584 F.3d at 88 (internal quotation marks omitted); see, e.g., Lerner v. Fleet Bank, N.A., 318 F.3d 113, 117 (2d Cir.) ("Lerner"), cert. denied, 540 U.S. 1012 (2003). Under this standard, we conclude, for the reasons that follow, that the Complaint was sufficient to show Article III standing but insufficient to state a claim on which relief can be granted.

### A. Standing

#### 1. Article III Standing; Jurisdiction

No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies. . . . The concept of standing is

13

part of this limitation.

*Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37 (1976); see, e.g., *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992) ("*Lujan*"); *Allen v. Wright*, 468 U.S. 737, 750-51 (1984); *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975).

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"--an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . . Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (other internal quotation marks omitted) (emphases ours). If any of these three elements is missing, the federal court lacks jurisdiction to entertain the action. See, e.g., id. at 561; *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102-04 (1998). Only the second element--traceability--is at issue in the present case.

For the reasons that follow, we conclude that the court erred in ruling that, because the Complaint was insufficient to allege proximate cause, plaintiffs failed to show Article III standing, i.e., failed to show that their injuries were fairly traceable to UBS's acts.

2. "Fairly Traceable" vs. "Proximate Cause"

The traceability requirement for Article III standing means that the plaintiff must "demonstrate a causal nexus between the defendant's conduct and the injury." *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992); see, e.g., *Allen*, 468 U.S. at 756-59. Such a nexus is most easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at

14

issue. However, while the "indirectness" of an injury "'may make it substantially more difficult'" to show the "fairly traceable" element of Article III standing, i.e., "'to establish that, in fact, the asserted injury was the consequence of the defendants' actions," indirectness is "not necessarily fatal to standing," Simon, 426 U.S. at 44-45 (quoting Warth, 422 U.S. at 505), because the "fairly traceable" standard is lower than that of proximate cause, see, e.g., Bennett v. Spear, 520 U.S. 154, 168-71 (1997); Connecticut v. American Electric Power Co., 582 F.3d 309, 346 (2d Cir. 2009) ("American Electric Power"), rev'd on other grounds 131 S. Ct. 2527 (2011); Lerner, 318 F.3d at 122 n.8; Focus on the Family v. Pinellas Suncoast Transit Authority, 344 F.3d 1263, 1273 (11th Cir. 2003) ("Focus").

> Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence.

Lerner, 318 F.3d at 123 (internal quotation marks omitted) (emphasis ours); see, e.g., Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006) (with respect to "proximate causation, the central question . . . is whether the alleged violation led directly to the plaintiff's injuries").

The requirement that a complaint "allege[] an injury" that is "'fairly traceable' to defendants' conduct . . . for [purposes of] constitutional standing" is a "lesser burden" than the requirement that it show proximate cause. Lerner, 318 F.3d at 122 n.8. Thus, the fact that there is an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause but is not necessarily a basis for finding that the injury is not "fairly traceable" to the acts of the defendant. See, e.g., id. at 122 & n.8 (concluding that the plaintiffs' allegations that defendant banks' failure to report an attorney's malfeasance, which would have resulted in his suspension or disbarment and in plaintiffs' ceasing to invest with the attorney, was "sufficiently tenuous to fail to demonstrate proximate

15

causation"; but concluding that "we cannot say" that those assertions "do not allege an injury fairly traceable to defendants' conduct").

Accordingly, we, like other courts, have noted that, "particularly at the pleading stage, the 'fairly traceable' standard is not equivalent to a requirement of tort causation" and that "for purposes of satisfying Article III's causation requirement, we are concerned with something less than the concept of proximate cause." American Electric Power, 582 F.3d at 346 (other internal quotation marks omitted) (emphasis ours); see, e.g., Barbour v. Haley, 471 F.3d 1222, 1226 (11th Cir. 2006) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." (other internal quotation marks omitted)), cert. denied, 551 U.S. 1134 (2007); Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 72 (3d Cir. 1990) ("The 'fairly traceable' requirement . . . is not equivalent to a requirement of tort causation."), cert. denied, 498 U.S. 1109 (1991); Natural Resources Defense Council, Inc. v. Watkins, 954 F.2d 974, 980 n.7 (4th Cir. 1992) (same); Focus, 344 F.3d at 1273 ("no authority even remotely suggests that proximate causation applies to the doctrine of [Article III] standing" (internal quotation marks omitted)). As stated the Supreme Court stated in Bennett, it is "wrong[]" to "equate[] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." 520 U.S. at 168-69 (emphasis added). Rather, "at [the pleading] stage of the litigation," the plaintiffs' "burden . . . of alleging that their injury is 'fairly traceable' to" the challenged act "is relatively modest." Id. at 171.

In sum, the test for whether a complaint shows the "fairly traceable" element of Article III standing imposes a standard lower than proximate cause.

### 3. The Allegations of the FAC

The factual allegations in the Complaint in the present case (see Part I.A. above), taken in the light most favorable to plaintiffs, with all reasonable inferences drawn in their favor, asserted that at all pertinent times, Iran had a policy of promoting terrorism to injure and intimidate the Jewish residents of Israel and to cause the eradication of the State of Israel; that Hizbollah and Hamas are terrorist organizations; that Iran provided Hamas and Hizbollah with hundreds of millions of dollars to fund terrorist attacks; that Iran conditioned that funding on agreement by those organizations to conduct terrorist attacks on Israel and its residents; and that the bombings and rocket attacks between July 1997 and July 2006, in which plaintiffs and/or their family members were injured, were conducted by Hizbollah or Hamas. The plausibility of these allegations is supported by the facts that the State Department in 1984 listed Iran as a state sponsor of terrorism, in 1996 found that Iran continued to encourage Hizbollah and Hamas to engage in violence and terrorism and was the premier state sponsor of international terrorism, and in 2006 described Iran as the central banker for terrorism around the world.

The Complaint also alleged that Hizbollah and Hamas needed large sums of money to fund their operations; that those organizations, by reason of their nature and the existence of counterterrorism sanctions, could not freely use normal banking services such as checks or wire transfers; and that U.S. currency is a universally accepted form of payment. (See, e.g., FAC ¶ 56 (citing Congressional testimony of the United States Under Secretary of the Treasury for Terrorism and Financial Intelligence that, "[a]s the formal and informal financial sectors [have] become increasingly inhospitable to financiers of terrorism, . . . . [t]he movement of money via cash couriers is now one of the princip[al] methods that terrorists use to move funds" (internal quotation marks

17

omitted)).) The Complaint alleged that between 1996 and 2004, in violation of United States laws, UBS provided Iran with hundreds of millions of dollars in cash--transactions that UBS has publicly acknowledged.

UBS argues that the dollars provided by Iran to Hizbollah and Hamas cannot fairly be traced to the U.S. currency transfers to Iran from UBS because during the period when UBS was sending U.S. currency to Iran, Iran held billions of U.S. dollars in its reserves. (See UBS brief on appeal at 27; see also Exhibit 14 to Declaration of Daniel L. Cantor dated September 4, 2008, in support of UBS Motion To Dismiss FAC (March 27, 2007 news report of Iran's estimate that it had between $10 billion and $20 billion of its foreign reserves in dollars).) Plaintiffs argue that the fact that Iran was obtaining U.S. currency from multiple sources should not affect plaintiffs' standing to sue. We agree. Although the size of Iran's well-publicized reserve affects the issue of proximate cause, we cannot conclude that it prevents the Complaint from meeting the lower standard of fair traceability. Cf. Massachusetts v. EPA, 549 U.S. 497, 524 (2007) (rejecting the defendant's "erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum").

It is reasonable to infer that Iran's ability to amass U.S. currency was increased by UBS's transfers. Iran thus had available more U.S. currency than it would have had without UBS's transfers; the more U.S. currency Iran possessed, the greater its ability to fund Hizbollah and Hamas for the conduct of terrorism; and the greater the financial support Hizbollah and Hamas received, the more frequent and more violent the terrorist attacks they could conduct. The fact that plaintiffs did not more specifically describe the scale of UBS's financial transactions with Iran as a "primary" or "significant" source of Iran's cash supply is irrelevant. In sum, we cannot conclude that the Complaint

18

failed to allege sufficiently that plaintiffs' injuries in bombings and rocket attacks conducted by Hizbollah and Hamas were fairly traceable to UBS's provision of U.S. currency to Iran. Accordingly, plaintiffs have Article III standing to pursue their claims under the ATA.

B. The Sufficiency of the Complaint

Although we conclude that the Complaint should not have been dismissed for lack of Article III standing, we may affirm the judgment of the district court on any ground that finds a basis in the record, see, e.g., Bennett, 520 U.S. at 166-67, and we affirm because the Complaint failed to allege proximate cause sufficiently to state a claim on which relief can be granted, see, e.g., Lerner, 318 F.3d at 130 ("affirm[ing] the district court's dismissal of plaintiffs' RICO claims for lack of standing, but . . . do[ing] so under Rule 12(b)(6) for failure to state a claim"). Plaintiffs invite us to remand to the district court for analysis of the Complaint's sufficiency--arguing that that court lacked jurisdiction to proceed to the sufficiency question once it determined that plaintiffs lacked standing. We decline that invitation, both because we have determined that the district court did have jurisdiction and because the sufficiency of a complaint to state a claim is a matter of law and is particularly suitable for determination by a court of appeals, whether or not the sufficiency question has been addressed by the district court. See, e.g., McCall v. Pataki, 232 F.3d 321, 322-23 (2d Cir. 2000).

The private-civil-action section of the ATA, quoted in full in Part I.B. above, allows a United States national to bring an action in federal court for treble damages if he or she is "injured in his or her person . . . by reason of an act of international terrorism." 18 U.S.C. § 2333(a). In order to state a claim on which relief can be granted, the "[f]actual allegations" of a complaint "must be

19

enough to raise a right to relief above the speculative level," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("Twombly"), and make the claim at least "plausible on its face," id. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In addressing the sufficiency of a complaint we accept as true all factual allegations and draw from them all reasonable inferences; but we are not required to credit conclusory allegations or legal conclusions couched as factual allegations. See, e.g., Twombly, 550 U.S. at 555, 557.

In the present case, Count One of the Complaint asserted that UBS was civilly liable for its cash transfers to Iran on an aiding-and-abetting theory (see, e.g., FAC ¶ 138 ("[b]y its course of conduct described herein, defendant UBS aided and abetted acts of international terrorism, within the meaning of 18 U.S.C. §§ 2331 and 2333, carried out by Iran"); see also Introductory Paragraph to FAC ¶¶ 128-41 ("FIRST COUNT ON BEHALF OF ALL PLAINTIFFS[:] AIDING AND ABETTING INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)")). On appeal, plaintiffs seek a ruling that Count One states a claim on the basis that UBS may be held liable either as an aider and abettor or as a principal.

With respect to the causation element of § 2333, while plaintiffs purported to concede, both in their brief (see Plaintiffs' brief on appeal at 30) and at oral argument, that that section requires a showing of proximate cause, they argue that a showing of less than proximate cause, as that term is ordinarily used, suffices (see id. at 30-32). They also contend that the FAC sufficiently pleaded proximate cause by alleging that UBS committed "a per se violation of a statute . . . meant to protect a certain class of persons [including plaintiffs] from harm" (id. at 33) and that they were harmed; they

argue that in such circumstances "causation may be presumed" (id. at 36-37 (internal quotation marks omitted)), with the burden shifted to UBS "to prove that its wrongful conduct was not the cause of plaintiffs' harm" (id. at 33). We are not persuaded that Congress intended to permit recovery under § 2333 on a showing of less than proximate cause or that the Complaint contains plausible allegations that UBS's transfers of U.S. currency to Iran proximately caused plaintiffs' injuries.

First, we do not agree with plaintiffs' contention that the "by reason of" language chosen by Congress in creating a civil right of action under the ATA was intended to permit recovery on a showing of less than proximate cause, as the term is ordinarily used. The "by reason of" language had a well-understood meaning, as Congress had used it in creating private rights of action under RICO and the antitrust laws, and it had historically been interpreted as requiring proof of proximate cause. As described in Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992), Congress in 1890 provided a private right of action in § 7 of the Sherman Act for injuries to business or property "by reason of" a violation of the Sherman Act; "lower federal courts . . . read § 7 to incorporate common-law principles of proximate causation." Holmes, 503 U.S. at 267 & n.13. In 1914, Congress provided a private right of action in § 4 of the Clayton Act, using the "by reason of" language "borrowed from § 7 of the Sherman Act"; in 1983, the Supreme Court held, "as many lower federal courts had done before" it, "that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." Holmes, 503 U.S. at 267-68. When Congress enacted RICO in 1970 and provided a private right of action in 18 U.S.C. § 1964(c), "Congress modeled § 1964(c) on the civil-action provision . . . [in] § 4 of the Clayton Act," again using the "by reason of" language, Holmes, 503 U.S. at 267; and with respect to that language in RICO, "[t]he Courts of Appeals . . . overwhelmingly held that not mere

21

factual, but proximate, causation is required," id. at 266 n.11. In Holmes, interpreting the RICO provision, the Court held that the "by reason of" language required a showing of proximate cause, saying "[w]e may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. . . . It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them." 503 U.S. at 268.

We reach the same conclusion here with respect to the ATA--finally enacted in 1992, see Report of the Senate Committee on the Judiciary, 102-342, at 22 (1992) (noting that § 2333 was initially enacted in error in 1990 and was repealed in 1991, to be reenacted in 1992). Although the legislative history of the ATA indicates that Congress intended to create impediments to terrorism by "the imposition of liability at any point along the causal chain of terrorism," id., and plaintiffs rely on that language to argue that use of a standard lower than proximate cause in § 2333 is needed to implement that intent, we note that even without such a lower standard Congress did in fact impose liability--either civil or criminal--at each such point. And if, in creating civil liability through § 2333, Congress had intended to allow recovery upon a showing lower than proximate cause, we think it either would have so stated expressly or would at least have chosen language that had not commonly been interpreted to require proximate cause for the prior 100 years.

Nor are we persuaded by plaintiffs' contention that "because both federal and state antiterrorism laws were enacted to protect against the threat of international terrorism and because Plaintiffs' injuries occurred after UBS violated these laws, [proximate] causation should be presumed" (Plaintiffs' brief on appeal at 36). Plaintiffs argue, citing Liriano v. Hobart Corp., 170 F.3d 264, 271 (2d Cir. 1999) ("Liriano"), that "[a] basic principle of traditional tort law is that when a defendant

22

commits a per se violation of a statute or regulation meant to protect a certain class of persons from harm, and a person in this class is thereafter harmed, the burden shifts to the defendant to prove that its wrongful conduct was not the cause of plaintiffs' harm." (Plaintiffs' brief on appeal at 33; see id. n.9 (advocating "per se liability").) First, plaintiffs' reliance on Liriano is misplaced because, as is revealed by their quotation from that case, Liriano was discussing not proximate cause but "'cause-in-fact'" and "'but-for cause'" (Plaintiffs' brief on appeal at 33 n.9 (quoting Liriano, 170 F.3d at 271)). Second, plaintiffs' contention that proximate cause is established because they were injured after UBS violated federal law is a post hoc, ergo propter hoc proposition that would mean that any provider of U.S. currency to a state sponsor of terrorism would be strictly liable for injuries subsequently caused by a terrorist organization associated with that state. If Congress had intended to impose strict liability, we have no doubt that it would have found words more susceptible to that interpretation, rather than repeating the language it had used in other statutes to require a showing of proximate cause.

Further, the statutory scheme does not suggest that Congress intended a presumption of proximate causation to be read into § 2333(a) with respect to a defendant who had not been found guilty of a terrorism offense in a criminal proceeding. In subsections (b) and (c) of § 2333, Congress did in effect create some presumptions--indeed, irrebuttable presumptions--that could be applied in an action under § 2333(a). Thus, as against a defendant convicted of certain federal crimes involving homicides, kidnaping, hostage taking, and aircraft hijacking, subsection (b) of § 2333 in effect creates an irrebuttable presumption against the defendant with respect to each element of the offense of conviction. See 18 U.S.C. § 2333(b) ("A final judgment or decree rendered in favor of the United States in any criminal proceeding under [the listed sections] shall estop the defendant from denying

23

the essential allegations of the criminal offense in any subsequent civil proceeding under this section." (emphasis added)); see also id. § 2333(c) (same with respect to a criminal conviction under foreign law). There is no allegation in the Complaint that UBS has been convicted of such a crime; the fine imposed on UBS by the Federal Reserve was a "Civil Money Penalty" (FAC ¶ 82 (emphasis added)). As Congress, by its express provisions, created irrebuttable presumptions in subsections (b) and (c) usable against a defendant who had been convicted in a criminal proceeding, we cannot conclude that an intent to create any kind of presumption or burden-shifting mechanism with respect to a defendant who has not been so convicted is inferable from Congress's silence.

As discussed in Parts II.A.2. and 3. above, the burden of showing that plaintiffs' injuries were proximately caused by UBS's transfers of U.S. currency to Iran is higher than the burden of showing that plaintiffs' injuries were fairly traceable to those transfers. Although we agree with plaintiffs' contention that, despite the fact that Iran had billions of dollars in its reserves from multiple sources, plaintiffs' injuries are fairly traceable to those transfers in the Article III sense (because the transfers increased Iran's ability--and perhaps its readiness--to provide funding to Hizbollah and Hamas), we cannot agree that the Complaint sufficiently alleges proximate cause. The Complaint does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs. It does not allege that UBS provided money to Hizbollah or Hamas. It does not allege that U.S. currency UBS transferred to Iran was given to Hizbollah or Hamas. And it does not allege that if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured.

And while the Complaint alleges that "UBS knew full well that the cash dollars it was providing to a state-sponsor of terrorism such as Iran would be used to cause and facilitate terrorist

24

attacks by Iranian-sponsored terrorist organizations such as Hamas, Hizbollah and PIJ" (id. ¶ 108 (emphases added)), these are conclusory allegations that do not meet Twombly's plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by UBS to Iran and the terrorist attacks by Hizbollah and Hamas that injured plaintiffs. The fact that the transfers were made to a state sponsor of terrorism of course made it more likely that the moneys would be used for terrorism than if the transfers were to a state that did not sponsor terrorism. But the fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund. We see no nonconclusory allegation in the Complaint that plausibly shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by UBS.

Finally, we are not persuaded that the district court erred in concluding that plaintiffs had not stated a claim on which relief could be granted against UBS on an aiding-and-abetting theory, because it does not appear to us that Congress intended § 2333(a) to permit recovery on such a theory. In Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), which dealt with an action under § 10(b) of the Securities Exchange Act, the Supreme Court noted that

> Congress has not enacted a general civil aiding and abetting statute . . . . Thus, when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.

Id. at 182. The Court concluded that "an implicit congressional intent to impose . . . aiding and abetting liability" could not plausibly be inferred from "statutory silence." Id. at 185.

In the ATA, § 2333 is silent as to the permissibility of aiding and abetting liability. Further counseling against a judicial interpretation of that section as authorizing such liability is the

25

fact that there are sections of the ATA's criminal provisions--providing jurisdiction over, inter alia, United States nationals and habitual residents--that do refer to aiding and abetting liability. For example, § 2339B, which prohibits "knowingly provid[ing] material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), provides that there is jurisdiction over an offense under subsection (a) if, inter alia, "an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a)," id. § 2339B(d)(1)(F); see also id. § 2332g(b)(5) (same with respect to "aid[ing] or abet[ting]" the production and possession of antiaircraft missile systems); id. § 2332h(b)(5) (same with respect to "aid[ing] or abet[ting]" the production and possession of radiological dispersal devices); id. § 2339D(b)(6) (same with respect to "aid[ing] or abet[ting]" the receipt of military training from a foreign terrorist organization). We doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence. Accord Boim v. Holy Land Foundation for Relief and Development, 549 F.3d 685, 689 (7th Cir. 2008) (en banc) ("statutory silence on the subject of secondary liability means there is none; and section 2333(a) . . . does not mention aiders and abettors or other secondary actors"), cert. denied, 130 S. Ct. 458 (2009). It of course remains within the prerogative of Congress to create civil liability on an aiding-and-abetting basis and to specify the elements, such as mens rea, of such a cause of action.

26

# CONCLUSION

We have considered all of plaintiffs' contentions on this appeal and, except to the extent discussed above, have found them to be without merit. We affirm the district court's dismissal of the First Amended Complaint for failure to state a claim on which relief can be granted.

No costs.